# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

VERONICA GARCIA, and THE ESTATE
OF JORGE ALBERTO CARRERA ALVAREZ,
and VERONICA GARCIA, on Behalf of the
Minor Children, PCG, PCG, VCG, and SCG,

       Plaintiffs,

      v.                             No. CIV-13-0827 WJ/LAM

UNITED STATES OF AMERICA,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment, filed August 14, 2014 **(Doc. 51).**  This is a medical malpractice case brought under the Federal Tort Claims Act, 28 U.S.C. §1346(b)(1).  Plaintiffs allege that Defendants' failure to provide proper medical care to Jorge Alberto Carrera Alvarez when he received treatment at the Ben Archer Health Center in Las Cruces, New Mexico, and died a few days later at a hospital in El Paso, Texas.   Having reviewed the parties' briefs and applicable law, the Court finds that Defendant's motion is well-taken and, accordingly, it is GRANTED.

### BACKGROUND[1]

On June 22, 2011, Jorge Alberto Carrera Alvarez ("Mr. Carrera" or "Plaintiff"), accompanied by his wife Veronica Garcia ("Ms. Garcia") presented as a new patient at the Ben Archer Health Center ("BAHC") in Las Cruces, New Mexico, complaining of pain from his

---

[1]  These facts are supported by exhibits attached to the pleadings, and are undisputed unless otherwise noted.

gums.[2]   BAHC is a health clinic in Southern New Mexico that provides primary care to the public both for medical and dental health.  BAHC does not provide hematology or oncology treatment or services, but rather refers such patients to medical specialist providers.  Plaintiff saw Dr. Keith Stevener, a dentist at BAHC.   Visual exam revealed that Mr. Carrera had large amounts of calculus (tartar and plaque) and bleeding gums, and Dr. ordered a full debridement (removal of the plaque and tartar) and full mouth examination.   During the debridement, Mr. Carrera was diagnosed with "acute necrotizing ulcerative gingivitis" a condition of inflamed gums caused by bacterial infection.   Dr. Stevener treated him with a liquid topical astringent, gave instructions for the bleeding and provided various prescriptions, and directed Plaintiff to return in a month.   An appointment was set for August 4, 2011.   Dr. Stevener had trouble stopping the bleeding of Mr. Carrera's gums, but otherwise, Mr. Carrera was in no physical distress during this dental visit.

Plaintiff has agreed to dismiss any claims against Dr. Stevener, *see* Doc. 57 at 7.   Thus, Plaintiff's treatment by Dr. Stevener has no relevance to the Plaintiff's claims in this case except for background and for any relevance the dental record may have to the full medical evaluation done by BAHC on Plaintiff at his later appointment.   The Court also notes that Plaintiffs have not identified any expert witness to opine that Dr. Stevener violated the standard of dental care for Mr. Carrera and will provide no evidence on this issue.  *See* Deft's Statement of Fact No. 6 & supporting exhibits.   For this reason, Defendant is entitled to summary judgment on all claims against Dr. Stevener.

On the late afternoon of July 5, 2011, Mr. Carrera went to the BAHC Medical Clinic in Las Cruces as a first-time medical patient, complaining of headache and body aches. Lauri Greis,

---

[2]  Although "Plaintiff" refers to the personal representative of Mr. Carrera, who is deceased, the Court refers to Mr. Carrera as "Plaintiff" throughout, for ease of reference.

a Certified Nursing Practitioner ("CNP") at BAHC, was the attending medical provider.  She conducted a history and physical, noting Mr. Carrera's vital signs and symptoms on the medical chart.  CNP Greis documented that Mr. Carrera was experiencing fatigue, body aches, and had a skin rash that she identified as "purpura" (purple-colored spots and patches on the skin ) on his legs and in his mouth, but was otherwise stable.  Ms. Greis' assessment of Mr. Carrera was "purpura, questionable etiology."  She ordered a battery of laboratory tests including a complete blood count ("CBC"), comprehensive metabolic panel ("CMP"), thyroid stimulating hormone ("TSH"), urinalysis ("UA"), human immunodeficiency virus ("HIV") screen, hepatitis screen, and chest x-ray.  She instructed Mr. Carrera to have the labs drawn at BAHC that day, to abstain from work, to get rest, and to return in the morning.

The clinic obtained the lab results for the blood work taken the previous day by 8:00 a.m. on July 6, 2011. Doc. 51-4 at 35.   Mr. Carrera and his wife returned to BAHC at approximately 10:00 a.m. on July 6, 2011 to meet with CNP Greis and her assistant.   At the time of his return visit, Mr. Carrera complained of body aches and his temperature and pulse were slightly elevated.  His lab results revealed a very elevated white blood cell count, along with abnormal labs for his red blood cell counts, hemoglobin, hematocrit and glucose.  Ms. Greis diagnosed acute myeloid leukemia (cancer of the white blood cells), and told Plaintiff and his wife he required an immediate evaluation by a hematologist /oncologist.   Plaintiff appears to dispute some of the facts at around this point, although the Court finds that these purported factual disputes turn out to be either irrelevant, immaterial, or unresponsive.   Defendant provides evidence that on July 6, 2011, CNP Greis referred Mr. Carrera to the offices of Dr. William Adler and Dr. Robert Francis at the University of New Mexico Cancer Center ("UNM") in Albuquerque.  Plaintiff disputes this fact, although the nature or purpose of the dispute is not

clear.  It is undisputed that on the afternoon of July 6, 2011, the same day Plaintiff returned to see CNP Greis and get his lab results, Plaintiff was sent to the University Medical Center Thomason Hospital ("UMC") Emergency Room in El Paso, where he was treated and died two days later on July 8, 2011.  *See* Pltff's Ex. 57-16 (death certificate).

The complaint asserts nine counts as follows: Loss of Chance; Negligence; Loss of Consortium; Prima Facie Tort; Vicarious Liability; Medical Malpractice; Wrongful Death, Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress. Plaintiff alleges that Ms. Greis knew the seriousness of the results but failed to show the results to any doctor, and instead, Plaintiff and his wife were sent home.  The complaint also asserts that after Plaintiff arrived home that same day, the clinic called Mr. Carrera to notify him that he needed to go to the UMC Emergency Room in El Paso, and that a doctor would be flying in from Albuquerque to UMC to start the blood transfusion.  When Plaintiff and his wife arrived, however, the hospital was not aware of the situation, and that Mr. Carrera passed away "later" after UMC in El Paso started treatment.   The complaint states that the BAHC employees sent Mr. Carrera and his wife to UMC in El Paso "without proper arrangements, endangering his health, and most likely causing his death. . . ."  Compl., ¶ 30.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate when there are no genuinely disputed issues of material fact and, viewing the record in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law.  *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007); *Boling v. Romer*, 101 F.3d 1336, 1338 (10th Cir. 1996).  Once the party moving for summary judgment properly supports its motion, it is incumbent on the non-moving party to

respond with some showing of an issue of genuine material fact.  *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978 (10th Cir. 1991), *overruled on other grounds by Kendrick v. Penske Transp. Svcs.*, 220 F.3d 1220, 1228 (10th Cir. 2000).

The presentation of facts by Plaintiff's counsel is haphazard and confusing, and does not follow the requirements of this Court's local rule.  This local rule, D.N.M.LR-Civ.56.1, requires that a response "contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist."  It also requires that *each* fact in dispute must be numbered and "refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed."   Instead, Plaintiff skips over the first ten of Defendant's statements of fact ("SOF") and starts to present evidence in response to SOF 11.  Moreover, the evidence presented in the response does not necessarily coincide with the SOF as set forth by Defendant.  For example, Plaintiff does not specifically respond to or dispute Defendant's SOF 7, which states that CNP Greis did not breach the standard of care when she treated Plaintiff and referred him to a cancer specialist; yet in a later paragraph responding to SOF 11, Plaintiff contends that Greis' actions "fell below the standard of care."  At the same time, this same response sets out several specific facts that do not necessarily concern CNP Greis' actions.[3]   Another problem with Plaintiff's responses to facts is

---

[3]  SOF 11 states in part:
> When Carrera and his wife returned to BAHC the following morning, CNP Greis had received the abnormal laboratory results, and she told the Carreras that he likely had leukemia; explained the urgent need for care by a cancer specialist; and, that delay could cause suffering, complication or even death. CNP Greis then promptly referred Carrera to Drs. William Adler and Robert Francis, oncologists / hematologists employed at the University of New Mexico Cancer Center in Albuquerque, New Mexico.

Plaintiff responds simply by stating that the referral was not independently documented, and the actions by CNP Greis fell below a reasonable standard of care.   However, Plaintiff offers no evidence or testimony to refute any of the facts set forth in SOF 11.  Further, the fact that the referral was not "independently documented" does not create a material issue of fact regarding whether the referral was actually made.

that some of them have no connection to the SOF presented by Defendant, taking as just one example Plaintiff's response to SOF 20.   Defendant's SOF 20 states:

> [i]n consultation with Dr. Francis, CNP Greis promptly sent Carrera to the Emergency Department at UMC Thomason Hospital Emergency Room in El Paso, Texas where cancer treatment facilities were available.   Carrera was admitted and received treatment beginning on July 6, 2011. . .

Plaintiff's response to SOF 20 states:

> Defendant is relying on this fact under inadmissible evidence by Doctor Francis' statements. Moreover, the receptionist and CNP Greis have conflicting testimony as to the advice given to the Patient. . .   As the receptionist never mentioned that she called CNP [sic] more than once, and that the conversations did not occur simultaneously.

The point of Plaintiff's response is a mystery.   Because there is no reference in Defendant's SOF either to the receptionist's testimony, or to any "conversation" of CNP Greis, this statement, like others offered by Plaintiff, is unresponsive to the cited SOF by Defendant.[4] Plaintiff does not explain why Defendant's SOF 20 contains "inadmissible evidence by Doctor Francis."   The Court does not see a specific evidentiary objection, nor would the Court necessarily find that Ms. Greis' testimony, referred to in the SOF or contained in the attached exhibits, constitutes hearsay.

Plaintiff's chaotic treatment of Defendant's facts makes it difficult for the Court to take an orderly fact-by-fact approach of the relevant information in this case.   For this reason, the Court will address the major categories or issues raised by Plaintiff and for which Plaintiff contends factual "disputes" exist.

**II.      Whether Plaintiff Presents Facts Relating to Delay or Lack of Information**

Plaintiff has taken the position that Mr. Carrera's death was a direct result of a lack of information regarding the seriousness of his condition and CNP Greis' unreasonable delay in

---

[4]    The Court has checked Plaintiff's responsive pleading to make sure the confusion was not simply a result of misnumbering—and it was not.

treating his medical condition.  However, Plaintiff fails to present any material dispute on either issue.

A.      Whether Plaintiff was Informed of the Urgency of His Condition and Need for Treatment

Plaintiff appears to claim that he was not given the proper information on his condition. It is undisputed that while Mr. Carrera did not understand English, the information given during his appointment at the BAHC was interpreted through his wife and a BAHC bilingual nurse, Gloria Marmolejo.  Greis Depo. at 55:5-9; 71:1-5.   CNP Greis testified that she felt that Mr. Carrera's condition required treatment, and that it required treatment in the "relatively near future" but did not involve emergency treatment.  Her treatment plan was to get him proper care as soon as possible.  Greis Depo. at 44:1-15.  Ms. Greis stated that Mr. Carrera was neurologically stable, had symptoms, and within 24 hours "we not only had a diagnosis, we had a plan for him, a good plan.  We were going to put him in the . . . best medical center in the southwest and he agreed to go. . . ."  *Id.* at 77:12-18.

After blood samples were taken, Plaintiff was told to return "first thing in the morning." Almaraz Depo. at 42.   CNP Greis' notes state that after discussing the lab results with Plaintiff, she explained to him and his wife that "delay [in treatment] could cause suffering complication, or even death."  Greis Depo. at 64:13-17.  Ms. Greis also instructed Plaintiff about diet and not to work; that she prepared and faxed the medical information and lab results to Dr. Francis' office about Plaintiff's condition; and discussed the notes with Dr. Francis.  Greis Depo. at 65:11-21. Later treatment notes state:

> Discussed case with Dr. Francis hematologist.  We finally received a call from patient's wife. . . Explained to Dr. Francis that patient's wife now explains that cannot go to Albuquerque at UNM as he requested.  He had requested they drive to UNM Albuquerque with records.  They are in country illegally and unable to go through border patrol.  We now know that this is acute leukemia and we have no facilities to treat in Las Cruces; therefore, hematologist suggests that patient

drives to University Medical Center (Thomason) in El Paso, go to emergency room**, leave immediately. Message given to wife who verbalized understanding**.  This was all translated by Gloria Marmolejo.  Explained **that this is a life-threatening situation and not to delay leaving.**

Greis Depo. at 70-71:12-5 (emphasis added); *see also* Marmolejo Dep. at 13-14:24-1 & at 17:12-14 (stating that Ms. Greis told Ms. Garcia she and Carrera needed to go to El Paso if not Albuquerque because "it was very important").

Plaintiff, on the other hand, presents no material facts to dispute Defendant's evidence that BAHC advised Plaintiff of the urgency of his condition, except for a general lack of recall.  Ms. Garcia, Plaintiff's wife, stated in her deposition that she was told that "it was an illness, that was cancer, that there were persons that we'd have treatment, that will overcome [sic], that nothing will happen."  Garcia Depo. at 58:2-7.  When asked if CNP Greis told her that immediate treatment was needed, Ms. Garcia answered "I don't remember."  *Id* . at 58:7-9.  Ms. Garcia also did not "remember" any mention of either Dr. Francis of Dr. Adler.  Garcia Depo. at 59:23-25.

Plaintiff also disputes the referral to Albuquerque because there is no independent medical record that shows that Mr. Carrera was referred to the UNM Emergency Room in Albuquerque.   Pltff's Fact "L."  This "fact" makes no sense as a source of dispute.   CNP Greis stated that she did not personally hand Plaintiff any document directing him to go to Albuquerque, but her testimony as well as that of other witnesses, supports Defendant's SOF 17, which states that CNP Greis advised Plaintiff not to delay in going to UNM Cancer Center and that she faxed his medical information and lab results to Dr. Francis.[5]   Further, Ms. Garcia's testimony is consistent with the fact that Ms. Greis referred Mr. Carrera to Dr. Francis at UNM.

---

[5]   Ms. Garcia's testimony is also consistent with the fact that Ms. Greis made the referral to Dr. Francis in Albuquerque.  She later advised BAHC that she and her husband could not travel to Albuquerque because of border patrol issues.  Garcia Depo. at 67:17-22.

As will be discussed further in a later section, when the couple never showed up in Albuquerque and it was discovered that Mr. Carrera and his wife were in the country illegally and did not travel to Albuquerque because of their fear that they would be stopped at the border patrol checkpoint between Las Cruces and Albuquerque.   As a result, there is no dispute of fact as to whether Plaintiff was informed of the urgency of his need for medical treatment and his referral to Dr. Francis.

Ms. Garcia also testified that no one from BAHC provided her or Mr. Carrera with a set of medical records to take with them.  Garcia Depo. at 57:17-22.  However, it is unclear which one of Defendant's SOF this refers to, or how this allegation fits into any of Plaintiff's claims, because there is no allegation or evidence that UMC in El Paso did not have Plaintiff's medical records or the necessary medical information necessary for his treatment.

B.      Conduct of CNP Greis and BAHC Staff Related to Treatment and Referrals

It is undisputed that Mr. Carrera showed up on July 6, 2011 at BAHC for his return visit at 10:00 a.m.  CNP Greis stated that she told him and his wife ("the woman with him") that Mr. Carrera had leukemia and that he needed treatment from a specialist; that the only place that could provide him with that level of care in New Mexico was in Albuquerque at the University of New Mexico and that there were no comparable local facilities.  She advised them to leave "right away."  Greis Depo. at 53-54.  She also contacted the specialist at UNM (Dr. Francis), notified Plaintiff that she had done so and that Dr. Francis would be expecting them on their arrival.  *Id.*  As indicated by her notes, Greis testified that she explained that delaying treatment could cause "suffering, complication, or even death."   Greis Depo. at 64:13-17.

Defendant's SOF 19 states that Carrera and his wife never went to Albuquerque.  Around 2:00 in the afternoon on July 6th, Dr. Francis called BAHC wanting to know where Mr. Carrera

was, since he had not yet arrived.   Efforts were made by BAHC staff members to track down Plaintiff.  Greis Depo at 72:2-5; & 87:7-21; Marmolejo Depo. at 17:6-14.   In an afternoon phone conversation with Ms. Marmolejo, Ms. Garcia advised said that she and her husband could not travel to Albuquerque for treatment since they were both in the country illegally.[6]

Plaintiff attempts, but unsuccessfully, to raise a dispute on whether BAHC ever referred Mr. Carrera for care at the UNM Cancer Care Center in Albuquerque.  Plaintiff's Fact "J" states that he and his wife "were never told they needed to travel to Albuquerque."   This is an unequivocal misrepresentation of Ms. Garcia's complete testimony.   On page 57 of her deposition, Ms. Garcia was asked if there was "any mention of you going up to Albuquerque?"  She responded "Never, no."  Garcia Dep. at 57:3-5.   However, on page 61, Ms. Garcia admitted that there was a conversation about going to Albuquerque "after I left the clinic, when I arrived to [sic] the house." *Id.* at 61:9-12.   Thus, the only issue Plaintiff has with Defendant's statement relating to the referral to UNM in Albuquerque is the exact time of referral, not the fact of referral.  *See, e.g.,* Garcia Depo. at 68:11-13 (that there no "never talk of going to Albuquerque or El Paso when we were there [during the clinic appointment]").[7]  The uncontroverted evidence is that Mr. Carrera was in fact referred to Dr. Francis at the UNM Cancer Center before 2:00 p.m. at the very latest, on July 6, 2011 and therefore any dispute about the exact time of the referral is immaterial.[8]   Nor does Plaintiff offer any facts disputing the steps taken by Ms. Greis to contact Dr. Francis at UNM and apprise him of Plaintiff's impending arrival and medical condition, preparing Dr. Francis for Plaintiff's arrival.

---

[6]   Defendant's SOF 19 incorrectly refers to "Barbara" instead of "Gloria" Marmolejo.

[7]   Even the complaint asserts that Plaintiff was told to go to Albuquerque for treatment because he needed a blood transfusion." Compl., ¶ 26.

[8]   Plaintiff himself offers the testimony of Ms. Greis which is consistent with this chronology.  *See* Doc. 57 at 8, Resp. to SOF 17 (citing Greis Dep. at 110:11-12).

Plaintiff cites to testimony by Ms. Garcia that during the July 6th return visit to the clinic, she and her husband were directed to Mexico for medical care during because Mr. Carrera did not have health insurance.  This is a smokescreen to mask Plaintiff's inability to create a factual dispute concerning the alleged delay in medical treatment.   Ms. Garcia testified that CNP Greis told her that she and Mr. Carrera could go to Mexico for treatment or to a "clinic where they make experiments with people that have cancer, and they don't charge, at no cost to you." Garcia Depo. at 53:12-19.  Ms. Garcia stated that they decided to go to Mexico instead of the free clinic in Las Cruces, and that it was understood that at the time they left the clinic, they were on their way to Mexico.  Garcia Depo. at 69:1-15; at  60:17-18 (". . . we agreed with [Ms. Greis] to take the option to go to Mexico. . . .").   Again, even if this is true, Ms. Garcia stated that she was referred to Albuquerque when she arrived home from the clinic on July 6, 2011.

Mr. Carrera and Ms. Garcia never went to Albuquerque.  The reason why Plaintiff never traveled to Albuquerque to see Dr. Francis is undisputed: the couple realized that they would have problems crossing through the border checkpoint at Truth or Consequences, New Mexico between Las Cruces and Albuquerque.   When CNP Greis found out that the couple did not show up to see Dr. Francis in Albuquerque, she gave instructions to Ms. Marmelejo to find out why. Ms. Marmelejo telephoned Ms. Garcia, who informed her that she and Mr. Carrera were in the country illegally and did not want to travel through the border patrol checkpoint.[9]   Greis Depo. at 70:12-25; 72:1-14.  At that point, Ms. Greis felt there was "no other option except to send him to El Paso" and instructed Ms. Marmolejo to tell Ms. Garcia to take Mr. Carrera to the UMC emergency room in El Paso.   *Id.* at 72:8-20.  Ms. Marmolejo's testimony is consistent with the

---

[9]   At the time BAHC discovered Plaintiff had never gone to Albuquerque to see Dr. Francis, CNP Greis was at a dental appointment and was giving Ms. Marmolejo instructions in handling these affairs over the phone.  Greis Depo. at 71:8-22.  However, the Court sees no relevance at all to the fact that CNP Greis was directing Plaintiff's care by phone.

testimony of CNP Greis.   She testified that she spoke with Ms. Garcia, who told her that Mr. Carrera did not "have papers to pass" the border patrol checkpoint.   Ms. Garcia asked if they could have "a letter" to allow them to pass through.   *See* Marmolejo Depo. at 12-13:18-5.   Ms. Marmolejo made some inquiries and ascertained that a letter could be provided with Mr. Carrera's diagnosis, but she advised Ms. Garcia that such a letter would not guarantee their ability to pass through the checkpoint.   *Id.* at 23-24:25-5.   Plaintiff and his wife were told to go to the UMC emergency room in El Paso with their records.   Greis Dep. at 72:2-14; Marmolejo Depo. at 12-13:22-9 (advising Ms. Garcia to go to Thomason Hospital in El Paso because Mr. Carrera "needed to be seen"); *Id.* at 22:21-25 (advising Ms. Garcia that she needed to go to Thomason [UMC in El Paso] Hospital because was an oncologist there); Garcia Depo. at 67:17-22 (couple chose to go to UMC hospital in El Paso because Mr. Carrera was concerned about passing through the checkpoint at T or C).   In addition, the report of Plaintiff's nursing expert Christina Sanders concedes these facts presented by Defendant.   Listed as one of the "relevant facts" leading to her "expert opinion," she includes the medical notes which state that BAHC was "informed that patient could not travel to [UNM in Albuquerque] due to issues with border patrol."   Doc. 51-2 at 2.

While Ms. Garcia testified that she was advised to travel to Mexico for treatment during the clinic appointment on July 6th at BAHC, the overwhelming evidence indicates that the couple opted to go to Mexico when they realized they would have trouble crossing the checkpoint to go to Albuquerque.   Ms. Marmolejo testified that after realizing she could not be guaranteed a checkpoint crossing, Ms. Garcia stated that "she was not going to take him to Thomason [UMC in El Paso], that she was going to take him to Mexico instead."   Marmolejo Depo. at 24:6-15; *Id.* at 24:6-15 (that Ms. Garcia stated "I'm going to Mexico" when asked to

confirm that she would take her husband to UMC in El Paso).   In contrast, Ms. Garcia's own testimony is inconclusive.  When asked whether she told anyone at BAHC that she did not want to go to Albuquerque because she and her husband did not have legal status in this country, she claimed didn't "remember."  Garcia Depo. at 63:10-23.

In another attempt to offer evidence disputing Defendant's facts, Plaintiff claims that UMC in El Paso did not have any information about Mr. Carrera, and that a nurse from the UMC emergency room contacted BAHC to complain about the handling of Mr. Carrera because he had not been transported by ambulance.  See Ex. 14, Bazan Depo.  Plaintiff claims that this evidence conflicts with the testimony that Ms. Garcia said she was going to Mexico.   However, this Court cannot fathom any connection between Ms. Bazan's testimony and whether Ms. Garcia stated she was going to Mexico or not.  Ms. Bazan testified that an emergency room nurse from UMC, Thomason (El Paso) called BAHC and was "rude and upset" that the patient and his girlfriend (presumably Mr. Carrera and Ms. Garcia) had driven from Las Cruces to El Paso in their private vehicle instead of in an ambulance, apparently attributing that fact to Plaintiff's legal status ("I don't care if they are aliens from outer space. They should have been sent by ambulance to ER").

There is no relevance to the statements made by the UMC nurse as relayed by Ms. Bazan. First, the UMC nurse had no information to know whether an ambulance had been offered and declined and had no knowledge regarding the reason Plaintiff was referred to El Paso in the first place.   Ms. Greis testified that Mr. Carrera was offered, but declined the offer of an ambulance. Greis Depo. at 86:14-19; 50:7-14; 126 (""He could go by ambulance. We always offer that.  But it would have been an ambulance that he would have had to pay for.  And he said, "No, no, no.  I don't have enough money for that.  We'll go by car").    Second, even taking those statements at face value and in Plaintiff's favor, they have no bearing on whether Ms. Garcia stated she and

13

husband wanted to go to Mexico for treatment since there is no dispute on that issue by either

party.   By her own testimony, Ms. Garcia indicated that at some point, she intended to travel to

Mexico for her husband's medical treatment.   Ms. Greis was also aware of, and concerned for,

the couple's intention to go to Mexico for treatment:

> [the couple was] still planning to go to Mexico even after all this time, and that
> further reinforced my fears for this man's safety.   So, I told her [Gloria] to tell
> him to go to University Medical Center, also known as Thomason, **immediately.**
> I did not want him trying to go out of the country.   I don't know the facilities at all
> in Mexico.   Plus it would have taken longer and further delayed [sic].

Greis Depo. at 126:17-25.   By the time Ms. Greis redirected Plaintiff and his wife to

UMC in El Paso, Mr. Carrera's treatment had already been delayed because of the border

patrol issue.   Ms. Greis explained why she directed Plaintiff to the UMC emergency room

in El Paso:

> Q.      So then there was—after that discussion [the 2:00 p.m. phone call from
> Dr. Francis], the answer goes to say that you suggested to Mr. Carrera to go to the
> ER at Thomason University Medical Center for admission.
>
> A.      To the ER for evaluation.   **We had no choice at that point.**
>
> Q.      Why do you think at that point he needed to go to the ER for evaluation?
>
> A.      He had been out of medical supervision for longer than he should have
> been.   I was also dealing with people who were noncompliant, who were not
> truthful.   And they may have had their reasons.   Some people are embarrassed.[10]

Greis Depo. at 110:11-25 (emphasis added).

Thus, Plaintiff offers no evidence to dispute the following facts, which the Court

considers as undisputed: (1) Plaintiff was referred to Albuquerque for treatment at UNM by Dr.

---

[10]  The complaint contains no mention of border patrol issues.  *See* Compl, ¶ 27 (stating that the couple was not able
to travel to Albuquerque because their care was not in good condition).  As discussed earlier, the uncontroverted
evidence in the underlying pleadings is that Plaintiff and his wife would not be able to get to Albuquerque because
they would have problems crossing the T or C checkpoint between Las Cruces and Albuquerque.   Of course, the
reason for misrepresenting this information in the complaint could be due, as Ms. Greis stated, to reluctance or
embarrassment in making the admission.

Francis either during the clinic appointment on July 6, 2011, or at the very latest, before 2:00 that afternoon which was the time Dr. Francis had expected the couple to arrive and called to find out why Plaintiff had not arrived at UNM; (2) Plaintiff and his wife did not travel to the UNM Cancer Center in Albuquerque as directed because of their concerns over being able to travel through the border patrol checkpoint; and (3) Plaintiff was redirected to UMC in El Paso when Ms. Garcia informed BAHC staff members that the couple was in the country illegally and could not travel through the border patrol checkpoint and in an effort to avoid further delay in beginning appropriate  treatment for Mr. Carrera.

## III.    Whether Plaintiff Has Presented Facts Relevant to Causation

Even if the Court had found that material issues of fact existed with regard to BAHC's treatment of Plaintiff's condition, those disputes mean little without evidence of causation.   In cases involving medical malpractice, a plaintiff must establish, through expert testimony, that a defendant's conduct more likely than not was proximately caused by the act of negligence.  *See Alberts v. Schultz*, 126 N.M. 807 (1999) citing numerous cases supporting the " reasonable medical probability" standard); *Quintana v. Acosta,* 316 P.3d 912 (Ct.App. 2014) ("the standard in New Mexico is proof to a reasonable degree of medical probability"); *Lopez v. Southwest Community Health Servs*., 114 N.M. 2, 6-7, 833 P.2d 1183, 1187-88 (Ct.App.1992) (indicating New Mexico law requires negligence be established "to a degree of reasonable medical probability" ); *Schrib v. Seidenberg*, 80 N.M. 573, 575, 458 P.2d 825, 827 (Ct.App.1969) (finding of malpractice is substantially supported by experts' testimony that, "as a reasonable medical probability," physician's act proximately caused injury).  Plaintiff in this case offers the testimony and reports of two experts, nursing expert Christina Sanders and oncologist Dr. Robert Gale, M.D.   Even viewing the facts as favorably as possible to Plaintiff, neither expert offers

any testimony which suggests that actions taken by CNP Greis or any BAHC staff member caused Mr. Carrera's death.

A.   Defendant's Expert Testimony

Dr. Ilah Jones, M.D., Defendant's expert, opined that CNP Greis was "very thorough" and did a "good job" of diagnosing Mr. Carrera with leukemia and setting up the referral process. Jones Depo. at 50:15-22; 72:1-14.  He testified that nothing else could have been done at BAHC to treat Mr. Carrera, that he needed to be seen by a hematologist; that a referral to the appropriate specialist in Albuquerque was made by phone calls "very quickly"; that efforts were made to get him there by ambulance, which Plaintiff declined.   Based on his review of the record, Dr. Jones stated that CNP Greis and other BAHC staff communicated the urgency of Mr. Carrera's situation to both him and his wife.  Jones Depo. at 103:2-8.  His opinion was that the BAHC providers "did the best they could" and that their efforts were even "a little over and above what they were expected to do" in trying to track Mr. Carrera down when he did not show up at Albuquerque to see Dr. Francis.   Jones Dep. at 104 at 5:2-14.

In order to preclude summary judgment, Plaintiff must provide evidence of causation through his own expert testimony to rebut Dr. Jones' testimony.

B.   Dr. Robert Gale's Testimony

Plaintiff's expert, Robert Gale, M.D., testified that he was tasked with opining "on the accuracy of Mr. Carrera's diagnosis and on the outcomes of persons with that diagnosis."  Gale Depo. at 24:7-20.   However, over and over again, he stated that he had no opinion whether CNP Greis' referral of Mr. Carrera to Dr. Francis or her treatment of Mr. Carrera fell below the standard of care because it was outside the scope of his area of designated expertise:

- Dr. Gale stated that he had no opinion on any of the entries regarding Mr. Carrera made by Ms. Greis on July 5th because it was "outside of my area of designated expertise." Gale Dep., Doc. 51-3 at 2:9-18.

- Dr. Gale did not have "problem or an opinion" as to Mr. Greis' referrals for specialist care, Dr. Gale because it was "[o]utside the area of my designated expertise."  Gale Depo. at 35-36:21-5.

- When he was asked if there was something that Ms. Greis "should or should not have done," Dr. Gale responded that such an opinion was also "[o]utside of my area of designated expertise." Gale Depo. at 36:14-19.

- When asked if it was appropriate for Ms. Greis to refer Mr. Carrera for diagnosis and treatment at the UNM Cancer Center, Dr. Gale stated that it was "[o]utside of my area of expertise."  Gale Depo. at 56:20-23.

- Dr. Gale stated that he did not have an opinion as to whether Ms. Greis' treatment of Mr. Carrera was appropriate or not.  Gale Depo. at 57:1-5.

Dr. Gale also had no opinion on the standard of care provided by CNP Greis and had no opinion on whether CNP Greis or other providers at BAHC should have referred Carrera, after the leukemia diagnosis, to a local hospital in Las Cruces for his initial cancer treatment:

- no opinion on whether a federally qualified health clinic such as BAHC could have administered the necessary drug treatment for Mr. Carrera.  Gale Depo. at 70-71:19-12.

- no opinion on whether there was any hospital in Las Cruces that could have treated Mr. Carrera with any of the necessary drugs.  Gale Depo. at 71:11-21.

- no opinion or knowledge on whether there were any other facilities in New Mexico, other than the UNM Cancer Center, that can provide the type of care indicated for Mr. Carrera. Gale Depo. at 76:19022.

Dr. Gale stated that he was asked only to give an opinion only on whether Mr. Carrera's leukemia could be successfully treated.  His report stated that "more likely than not," Mr. Carrera had acute myeloid leukemia ("AML") (which is consistent with Ms. Greis' diagnosis), and that he would have achieved a "complete remission" of the disease "had he

received therapy with appropriate doses and schedules of anti-leukemia drugs."   Gale Rep't, Doc. 51-2 at 6.   However, these findings have absolutely no relevance to the only questions in this case that matter—which is whether the conduct of CNP Greis and other BAHC staff contributed or caused Mr. Carrera's death.   Dr. Gale offers only the opinion that Mr. Carrera had AML and that this disease is treatable with the appropriate drug regimen, but his opinion is useless as to an opinion on why Mr. Carrera did not go into remission when he received the appropriate chemotherapy drugs at UMC in El Paso, much less any opinion on whether any conduct on the part of CNP Greis or other providers at BAHC played any part in causing Mr. Carrera's death.   Thus, Dr. Gale's testimony and opinion is insufficient to rebut Dr. Jones' testimony or to provide any evidence of legal causation between the conduct of CNP Greis or other BAHC providers and Mr. Carrera's death.

C.   Christina Sanders' Opinion

Nursing expert Christina Sanders had no issue with CNP Greis' handling of Mr. Carrera's treatment on July 5, 2011.   Sanders Depo. at 34:12-18.   However, she opined that both CNP Greis and BAHC fell below the standard of care in two ways:   (1) BAHC's failure to note the receipt of the lab results with a "Critical Values Stamp" to note the urgency of the results; and (2) that BAHC providers should have sent Mr. Carrera to a hospital emergency room for stabilization before being referred to UMC Thomason Hospital.   Sanders Depo., Doc. 51-4 at 37:22-25; 38:2-7; 42:16-19.

*1.   Critical Value Stamp*

Ms. Sanders opined that the failure to utilize a "Critical Values Stamp" on the lab results was a standard of care issue for the facility (BAHC) rather than for the nurse practitioner. Sanders Dep. at 31:13-21.   However, she conceded that while the management of the critical lab

values was in violation of BAHC policy or protocol, it had no bearing on Mr. Carrera's treatment or health because Mr. Carrera "was seen pretty much at the same time that the laboratory results were being reviewed." Sanders Depo at 32:1-9.

       2.      *Ambulance Transport and Emergent Care*

Ms. Sanders opined that Mr. Carrera was too sick to travel a long distance to a facility that could treat him properly, and that had he been sent to the local emergency department, transportation arrangements could have been made to transport him safely to a facility where he could receive the care that he needed. Sanders Depo. at 43:16-25.

CNP Greis did eventually advise the couple to go to the UMC emergency room in El Paso because she was concerned about the delay that had occurred when Mr. Carrera and his wife had not shown up in Albuquerque to see Dr. Francis, and because there was no other option at that point. As discussed previously, Plaintiff offers no facts which dispute CNP Greis' redirection of the couple to the UMC emergency department or the reason why Mr. Carrera and his wife did not travel to Albuquerque.

Initially, CNP Greis did not feel that the lab results warranted an immediate transfusion. Greis Depo. at 65:7-10. She determined that while Mr. Carrera needed to be treated "as soon as possible," (Greis Depo. at 37:11-13), his condition was not an emergency as long as steps were being taken to get him to see the appropriate medical providers. *See* Greis Depo. at 44:1-16. In light of Ms. Sanders' testimony, Plaintiff has offered what appears to be a dispute of fact as to whether Mr. Carrera should have been transported to an emergency room initially. However, this dispute of fact does not preclude summary judgment for Defendants because it is not material and fails to establish causation. While Ms. Sanders testified that Mr. Carrera should have been treated first at a local emergency room in Las Cruces, she admitted that neither of the

two emergency rooms in Las Cruces was capable of rendering care to someone with leukemia. Sanders Depo. at 42-43:20-9.    Ms. Sanders opined that because Mr. Carrera showed signs of bleeding, had a high white blood count, fever and an elevated heart rate, he should have been referred to the local emergency room.  Sanders Depo. at 41:1-17.  Nevertheless, Ms. Sanders stated that she did not have a "causation opinion" as to whether the practice and management of Mr. Carrera's case by CNP Greis caused his death:

> **I don't have a causation opinion**.  I think the earlier you have access to care, the higher the likelihood that you can have a positive result in the end, but **it's outside of my scope of practice to opine on causation in this matter.**

Sanders Depo. at 56-57:10-4 (emphasis added).  Ms. Sanders also opined that some of the medical notes were "not that clear" in that she "couldn't figure out" regarding exactly when Mr. Carrera was seen at the clinic and a "four-hour lapse of time" between when he was seen at BAHC on July 6th and being told to go the emergency department in El Paso.  *Id.* at 57-58:12-15.   However, Ms. Sanders did not consider this lack of clarity to constitute a violation of the standard of care.  Sanders Depo. at 58:11-23.

Thus, neither of Plaintiff's experts offers any opinion to challenge the opinion of Defendant's expert, Dr. Jones; and neither can offer any opinion of legal causation regarding the conduct of CNP Greis or any BAHC provider.    Plaintiff contends that Defendant "fails to understand the theory of negligence and misinterprets [New Mexico case law], including the relevant law on causation."  Doc. 57 at 10.    The shortcomings actually belong to Plaintiff because he offers no evidence at all suggesting that CNP Greis' treatment (or treatment by any BAHC provider) contributed to Mr. Carrera's death.  In quoting NM-UJI 13-1101, Plaintiff appears to be aware of the required evidentiary showing in a medical malpractice case.  That jury instruction instructs the fact finder that "the **only way** in which you may decide" whether a

doctor or health care provider possessed and applied the knowledge and used the skill and care which the law required of him or her "is from evidence presented. . . by [doctors or other health care providers] **testifying as expert witnesses."**    NM-UJI 13-1101 (emphasis added).   It is ironic that in this case, evidence of breach of duty and causation on the part of CNP Greis or other BAHC providers is exactly what is lacking.   Defendants are therefore entitled to summary judgment on all of Plaintiff's claims.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiff offers no material fact disputing Defendant's statements of fact regarding Mr. Carrera's treatment by CNP Greis or BAHC providers.   Any factual disputes presented by Plaintiff are immaterial, irrelevant or unresponsive.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (mere existence of some alleged, immaterial factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment).   In addition, Plaintiff offers none of the required expert testimony attesting to legal causation.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (**Doc. 51**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order; Defendant is entitled to summary judgment on all of Plaintiff's claims against Defendant, including claims asserted against CNP Greis, Dr. Stevener and other BAHC providers.

The Court shall enter a Final Judgment by separate pleading.

_____
UNITED STATES DISTRICT JUDGE